Erin Rose Ronstadt, SBN 028362
Kevin Koelbel, SBN 016599
Clayton W. Richards, SBN 029054
OBER PEKAS RONSTADT
3030 N. 3rd Street, Suite 1230
Phoenix AZ 85012
Phone: (602) 277-1745
Fax: (602) 761-4443
erin@oberpekas.com
kevin@oberpekas.com
clayton@oberpekas.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Charles Ellis,<br><br>Plaintiff,<br>v.<br><br>The Group Life Insurance and Disability Plan of United Technologies Corporation, an ERISA benefit plan; Liberty Life Assurance Company of Boston, a plan fiduciary; and United Technologies Corporation, a plan administrator,<br><br>Defendants. | No.<br><br>**COMPLAINT** |

For his claims against The Group Life Insurance and Disability Plan of United Technologies Corporation (the "Plan"), an ERISA benefit plan; Liberty Life Assurance Company of Boston ("Liberty"); and United Technologies Corporation ("UTC") (collectively "Defendants"), Plaintiff Charles Ellis ("Mr. Ellis" or "Plaintiff") alleges as follows:

## *Jurisdiction, Venue And Parties*

1. This action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA").

2. UTC is the Plan Sponsor, Plan Administrator, a plan fiduciary, and employer.

3. Mr. Ellis currently resides in Maricopa County, Arizona and has been a resident of Maricopa County at all times since becoming a Plan participant.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

4. The Plan and UTC, have their principal place of business in the state of Connecticut.

5. Liberty has its principal place of business in the state of Massachusetts.

6. Defendants Liberty and UTC are licensed and authorized to do business in Maricopa County, Arizona, and reside and are found within Maricopa County within the meaning of the jurisdiction and venue provisions of ERISA, 29 U.S.C. § 1132 and 28 U.S.C. § 1391.

7. This Court has jurisdiction over the subject matter of this action under ERISA, 29 U.S.C. §§ 1132(a), 1132(e)(1), and 28 U.S.C. §§ 2201-02 (declaratory judgments).

8. Venue is proper in this Court under ERISA, 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1391(b).

9. The Plan is a purported ERISA benefit plan established and maintained by UTC for the benefit of its employees.

10. Mr. Ellis was a participant and beneficiary of the Plan as an employee of UTC.

11. UTC insured benefits under the Plan with Liberty Policy No. GF3-810-258966-016.

12. Liberty is also the third-party claims administrator for the Plan and a Plan fiduciary.

13. UTC and Liberty have a duty to administer the Plan prudently and in the best interest of all Plan participants and beneficiaries.

14. At the time Mr. Ellis sought LTD benefits under the Plan, Liberty administered claims for UTC under the Plan, acted on behalf of the Plan, and acted as an agent of UTC and/or the Plan to make final decisions regarding the payment of disability benefits for the Plan and to administer the Plan.

## GENERAL ALLEGATIONS

*Mr. Ellis's Employment*

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

15. Mr. Ellis began working for UTC in August 1988.

16. The last role he had at UTC was Operations Manager II, in which he oversaw the Manufacturing Engineering and Facilities Teams.

17. Mr. Ellis was responsible for everything related to the facility and the Facilities Team, which required walking between various buildings and working outdoors on occasion in all types of weather.

18. Mr. Ellis was also responsible for creating systems to track maintenance work, training maintenance staff, coaching, and development.

19. With respect to the Manufacturing Engineering Team, Mr. Ellis job required in-depth logistical communications regarding production and design issues, process improvement, ergonomics, and employee safety.

20. Mr. Ellis's job required thinking quickly, clear communications, and the ability to "change gears" at any time.

21. Mr. Ellis also retained duties from his prior position as Manager, Enterprise Capital, Facilities and System Test Labs, which included developing and presenting site strategic business rationalization plans, ensuring capital expenditure budges were tracked, and overseeing large-scale capital improvement construction projects and any additional large-cost capital equipment.

22. He discontinued working on May 16, 2015 due to his disabling conditions.

*Plan Language*

23. The Plan provides protection for various "classes" of employees of UTC.

24. The Plan provides coverage for Class 3, which includes "[a]ll salaried Employees, including executives, electing the 66.67% plan."

25. The executives and salaried employees under Class 3 are not subject to the Mental Illness and/or Substance Abuse limitation under the Plan.

26. As of May 16, 2015, Mr. Ellis was considered Class 3 under the Plan.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

27. Even if Mr. Ellis is disabled from a Mental Illness, he is entitled to benefits until age 65 as long as he meets the other Plan requirements.

28. The relevant Plan definition of Disability is: 1) during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and 2) thereafter, the Covered Person is unable to perform, **with reasonable continuity**, the Material and Substantial Duties of Any Occupation.

29. “Material and Substantial Duties” means responsibilities that are normally required to perform the Covered Person’s Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

30. Under the Plan “Own Occupation” means the Covered Person’s occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person’s occupation as it is normally performed in the national economy.

31. Under the Plan, “Any Occupation”means any occupation, for which the Covered Person is reasonably fitted considering his training, education, experience, age, physical and mental capacity, and the salary of which is at least 80 percent of the Covered Person’s Basic Monthly Earnings.

32. The Plan defines “Treatment” as “consulting, receiving care or services provided by or under the direction of a Physician including diagnostic measures, being prescribed drugs and/or medicines, whether the Covered Person chooses to take them or not, and taking drugs and/or medicine.”

33. The Plan defines “Appropriate Available Treatment” as “care or services” that are:

1. generally acknowledged by Physicians to cure, correct, limit, treat or manage the disabling condition;

2. accessible within the Covered Person’s geographical region;

3. provided by a Physician who is licensed and qualified in a discipline suitable

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

to treat the

disabling Injury or Sickness;

4. in accordance with generally accepted medical standards of practice.

34. The Plan defines "Physician" as a person "licensed to practice medicine and is practicing within the terms of his license" or "a licensed practitioner of the healing arts in a category specifically favored under the health insurance laws of the state where the Treatment is received and is practicing within the terms of his license."

***Mr. Ellis's Disability***

35. On March 3, 2011, Mr. Ellis was in a motor vehicle accident (the "MVA"), after which he began experiencing neck stiffness, head pressure, tinnitus, cognitive complaints, paroxysmal episodes, and significant fatigue.

36. Mr. Ellis worked through these symptoms for as long as he could, but eventually had to cease due to worsening symptoms.

37. Since the MVA, Mr. Ellis has experienced disabling symptoms that prevent him from working with reasonable continuity.

38. At least three of his treating providers and a physical therapist performing a functional capacity evaluation witnessed these paroxysmal episodes.

39. On December 6, 2016, Dr. Caselli, a neurologist at the Mayo Clinic, reported witnessing a paroxysmal episode, noting Mr. Ellis's blood pressure as highly elevated at 206/104.

40. During the December 6, 2016 episode, Mr. Ellis was able to communicate "somewhat," and reported a loud ringing in his ears, blurred vision, and severe neck tightness. Mr. Ellis's symptoms and blood pressure began to normalize after approximately one hour.

41. Although his treating providers concur that Mr. Ellis is having credible symptomology during these episodes, no clear etiology has been determined.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

42. Drs. Moschonas, Oravivattanakul, and Dr. Caselli –all current or previous treating providers for Mr. Ellis - have ruled out many causes when treatments for those causes failed.

43. Mr. Ellis persists in having specialists evaluate him to determine the cause of his episodes, but none have provided a definitive answer.

44. Liberty faults Mr. Ellis for being seen by a large number of specialists.

45. Liberty faults Mr. Ellis for the medical community's failure to determine the etiology of his credible symptoms.

46. Mr. Ellis plans to continue seeking answers as long as his debilitating symptoms persist, and Liberty has unreasonably faulted him for doing so.

*Cervical Pain*

47. After the MVA, Mr. Ellis experienced neck discomfort and left upper extremity radicular complaints.

48. He underwent approximately twenty chiropractic treatment sessions with minimal improvement.

49. A July 29, 2011 cervical spine MRI revealed discogenic protrusion up against the left C6 nerve root at the level of C5-6.

50. Per Dr. David Reynolds' August 11, 2011 review of the MRI, "[t]his abnormality would clearly account for neck and left upper extremity radicular pain and paresthesias. It is also probably responsible for referred muscle contraction cephaligia, which is the basis of the pressure feeling in his head."

51. Mr. Ellis continues to experience periodic neck discomfort and radicular type pain, which contributes to his disabling symptoms.

*Cognitive Deficits*

52. Mr. Ellis's cognitive dysfunction has worsened since the MVA.

53. He was initially diagnosed with Post-Concussive Disorder, which was later changed to a traumatic brain injury ("TBI").

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

54. Mr. Ellis reports cognitive challenges and decline.

55. Mr. Ellis's reported cognitive issues are medically, diagnostically, and credibly documented.

56. He has been undergoing cognitive retraining therapy at AICCD for over two years.

57. Mr. Ellis ceased working because his symptoms were becoming difficult to manage and were becoming more severe.

58. Mr. Ellis has undergone multiple neuropsychological testing since 2012, which demonstrates his ongoing cognitive issues.

59. Mr. Ellis's cognitive functioning remains far below his baseline.

60. From a neuropsychological perspective, "[Mr. Ellis] remains unable to work in any position on a full-time competitive basis. Given the length of time since his accident and the continuing level of subjective and objective impairments, it is probable that he will be unable to return to competitive work in any area on an indefinite basis."

*Debilitating Fatigue*

61. Mr. Ellis experiences significant fatigue. This is well documented in the medical records, which confirm fatigue, cognitive impairment, shortened attention span, dizziness, and memory losses.

62. Mr. Ellis's recent diagnosis of obstructive sleep apnea further contributes to his fatigue.

63. Fatigue is known to reduce mental and physical functioning, as well as to impair judgment and concentration.

64. Mr. Ellis's chronic fatigue interferes with his ability to effectively complete work tasks and complete an eight-hour day of work.

*The Denial*

65. In a letter dated March 25, 2017 Liberty terminated Mr. Ellis's benefits (the "Denial").

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

***Liberty's Vocational Analysis***

66. Liberty hired Patricia Thal & Associates ("Thal") to conduct an Occupational Analysis/Vocational Review.

67. Thal's review was flawed.

68. Mr. Ellis was an Operations Manager II, overseeing the Manufacturing Engineering and Facilities Teams.

69. He supervised a ten-person manufacturing engineering team and a sever-person facility team, developed site strategies, managed capital expenditures, and created operational efficiencies.

70. Thal shoehorned Mr. Ellis's job into the Dictionary of Occupation Titles category of General Manager, Industrial Operations and focused on low physical demands in the generic job description.

71. The job duties of the occupation that Thal used for her review were narrower than Mr. Ellis's job duties and only superficially similar to Mr. Ellis's occupation.

72. Thal's January 19, 2016 report concluded that Mr. Ellis could meet the physical demands of his occupation, but did not opine of his ability to meet the cognitive demands because she had "not met with Mr. Ellis."

73. Thal is known to provide biased reports for Liberty.

74. In preparing her report and using the scope of her license to prepare such a report for Liberty, Thal violated the Code of Professional Ethics that governs her license as a Certified Rehabilitation Counselors ("CRC").

***Dr. Reva Klein's Medical File Review***

75. Liberty largely based the Denial on the medical file review conducted by Dr. Reva Klein on March 10, 2017.

76. Dr. Klein notes that Mr. Ellis's impairment is "based on spells of unknown etiology triggered by neck extension consisting of severe cervical muscular spasm causing pain to the level that caused freezing, crying and an inability to communicate," but suggests

**OBER PEKAS RONSTADT**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

"the evidence does not support the frequency of these spells would preclude full time work capacity."

77. Dr. Klein also opines that, "[t]here is insufficient reliable and valid evidence to support the presence of cognitive impairment that would preclude full time work capacity."

78. Dr. Klein did not consider the Plan terms in reaching her conclusion.

79. Dr. Klein did not assess Mr. Ellis's ability to perform, **with reasonably continuity**, the Material and Substantial Duties of Any Occupation in which he is reasonably fitted by training, education, experience, age, physical an mental capacity, and the salary of which is at least 80% of his Basic Monthly Earnings.

80. Dr. Klein was not aware of or ignored Mr. Ellis's job duties or the Plan language and could not have properly assessed his ability to work full time in his Own Occupation, or Any Occupation for that matter.

81. Dr. Klein also faults Mr. Ellis for not having a "unifying diagnosis to explain his symptoms," but that is not a requirement of the Plan.

82. There is nothing in the Plan that states that a definitive diagnosis is necessary or even that there is a requirement for objective evidence.

83. Notwithstanding the Plan's requirements, Dr. Klein's assertions that the "[c]linical exams did not provide evidence to support verifiable neurologic impairment" and "were consistently normal among providers" are false in light of the evidence.

84. Dr. Klein also failed to consider Mr. Ellis's non-exertional limitations, including cognitive deficits, fatigue, and medication side effects in conjunction with Mr. Ellis's paroxysmal episodes.

85. As outlined in the October 10, 2017 appeal, Mr. Ellis experiences significant and chronic fatigue, as well as cognitive deficits.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

86. This is well documented in his medical records. Mr. Ellis has consistently identified these issues as reasons he cannot return work, yet Liberty failed to properly address them.

87. Dr. Klein and Liberty failed to conduct a whole person analysis of Mr. Ellis.

88. The policy defines "Physician" as a person who "is licensed to practice medicine and is practicing within the terms of his license." In Arizona, the "practice of medicine" includes "the diagnosis . . . or the claim to be able to diagnose . . . any and all human diseases, injuries, ailments, infirmities or deformities, physical or mental, real or imaginary." A.R.S. § 32-1401(22).

89. This is especially consequential in Mr. Ellis's claim because Dr. Klein opines on the validity of several of Mr. Ellis's diagnoses; and, in some cases, disagrees with his treating providers diagnoses.

90. A doctor not licensed in Arizona is not permitted to offer opinions about a patient in Arizona.

91. Under these definitions, Mr. Elis could not rely on a doctor not licensed in Arizona to review his medical records and opine about his medical condition because that doctor would be practicing outside the scope of his or her medical license and would not meet the policy definition of "Physician."

92. That Liberty relies on physicians that Mr. Ellis would not be permitted to rely on violates the maxim, "what's sauce for the goose is sauce for the gander." *See Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412, 1418 (2016); *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1161, (9th Cir. 2001)(quoting *Harcourt Brace Jovanovich Legal and Prof'l Publ'ns, Inc. v. Multistate Legal Studies, Inc.,* 26 F.3d 948, 952 (9th Cir.1994)); and *AMERCO v. Shoen*, 184 Ariz. 150, 164, 907 P.2d 536, 550 (App. 1995).

93. Dr. Klein's report is internally inconsistent and contradictory. For example: Dr. Klein opines that, "[t]he presenting symptoms and findings may meet the diagnostic criteria for co-morbid depression (F32.9) and/or anxiety (F41.9) but defer an opinion

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

regarding possible impact on functional capacity to the appropriate specialist," but notes that, "[n]o additional specialty reviews or testing is needed;" and Dr. Klein states that Mr. Ellis's "level of care does not support the scope and severity of his headaches [as] impairing," "[Mr. Ellis's] treatment plan is partly consistent with the current standard of care," and "[r]eferral for assessment in these [psychological] cases would be indicated," but concludes, "[Mr. Ellis] was seen by a large number of specialists, potentially confusing the picture and delaying diagnosis and appropriate treatment."

94. Dr. Klein essentially argues that Mr. Ellis was seeing too many specialists, but also that he did not see enough. Regardless, under the Plan, Mr. Ellis has engaged in appropriate "Treatment."

95. Further, in the Denial, Liberty notes that Dr. Caselli did not respond to Dr. Klein's letter reiterating their telephone conversation. This is false. Dr. Caselli responded to Dr. Klein's letter on March 10, 2017 with additional comments.

96. In his letter, Dr. Caselli confirmed that Mr. Ellis's spells were "credible," "looked legitimate," and "did not look clinically suspicious for non-epileptic spells nor did they look like anxiety and/or panic."

*Dr. H. Daniel Blackwood's Medical File Review*

97. The Denial was also based on the medical file review conducted by Dr. H. Daniel Blackwood on December 22, 2016.

98. In his report, Dr. Blackwood opines that, "[f]rom a psychiatric/neurocognitive standpoint, [Mr. Ellis] is capable of sustaining full-time work in some capacity."

99. Dr. Blackwood falsely claims the information in various medical records reviewed "does not support any restrictions/limitations associate with [Mr. Ellis's] complaints."

100. Ample medical evidence supports that Mr. Ellis has restrictions and limitations from a psychiatric/neurocognitive standpoint.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

101. Dr. Blackwood did not assess Mr. Ellis's medical conditions under the terms of the Plan and could not have properly assessed Mr. Ellis's ability to work full time in his Own Occupation or Any Occupation.

102. Drs. Blackwood and Klein's opinions are arbitrary and against the clear weight of the medical evidence.

103. Neither Dr. Blackwood nor Dr. Klein have physically examined or even spoken with Mr. Ellis.

104. In its Denial, Liberty failed to explain why it credited its paper reviewers over Mr. Ellis's treating providers and unreasonably relied on Drs. Blackwood and Dr. Klein's opinions when it knew or should have known that they conducted inadequate and biased reviews.

105. A plan administrator "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).

106. Drs. Blackwood's and Klein's reports should be disregarded and considered evidence that constitutes Liberty's arbitrary and capricious conduct, abandonment of the policy, and breach of fiduciary duty.

***Surveillance***

107. Without justification, Liberty has conducted extensive surveillance on Mr. Ellis throughout the short period of time that he was on claim.

108. The excessive surveillance, which revealed nothing inconsistent with Mr. Ellis's reported functionality, demonstrates Liberty was fishing for evidence in order to terminate benefits.

109. The excessive surveillance has significantly harmed Mr. Ellis and his family.

110. The excessive surveillance in and of itself evidences how Liberty's structural conflict of interest unduly influenced the claims process. Liberty invested significant time

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

and money in trying to undermine Mr. Ellis's reported symptoms, because it did not want to accept liability on his claim.

111. Liberty must credit Mr. Ellis's credible, subjective complaints.

112. Liberty's tireless efforts to conduct surveillance of Mr. Ellis are not only an admission of its obligation to consider his subjective complaints, but also evidence of its desire to avoid paying on the claim.

113. Liberty contracted with Hub Enterprises, Inc. ("Hub") to perform video surveillance on Mr. Ellis on January 22, 2016, January 24, 2016, and February 10, 2016, as well as conduct an Internet search.

114. Hub obtained no video surveillance on January 22 or 24, 2016.

115. On February 10, 2016, Mr. Ellis was observed departing from a scheduled doctor's appointment and entering a vehicle as a passenger.

116. In October 2016, Liberty ordered five consecutive days of surveillance.

117. Hub conducted surveillance from November 4, 2016 through November 8, 2016 for eight hours a day.

118. In its five days of surveillance, including weekend days, Hub did not observe any activity of Mr. Ellis.

119. Less than one month later, Liberty contracted with G4S to perform another five consecutive days of surveillance on Mr. Ellis.

120. G4S conducted surveillance from December 7, 2016 through December 11, 2016 for approximately 7-8 hours a day.

121. Although Mr. Ellis's vehicle was observed in the driveway, no surveillance activity was observed on the first three days.

122. On Saturday, December 10, 2016 and Sunday, December 11, 2016, G4S observed Mr. Ellis assisting his wife with a yard sale.

123. After a total of 13 days of surveillance, Mr. Ellis was observed leaving his home only once for a scheduled doctor's appointment, to which someone else drove him,

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

and seen in his front yard one weekend during a yard sale. This level of activity cannot be equated with the ability to work a full 40-hour week.

124. The surveillance does not support Liberty's Denial.

125. The claim file contains no evidence that anyone in Liberty's claim department actually reviewed the video surveillance. Instead, Liberty relied on Dr. Klein's recounting of what she claimed to have observed in the videos, but her observations are wildly inaccurate.

126. Over 13 days of surveillance, Mr. Ellis was videotaped intermittently for a total of approximately two hours over two days, the majority of which time he was sitting, standing, talking, or walking about his front yard.

127. Mr. Ellis was less active the second day because he was "wiped-out" from the previous day, which is evident in the surveillance report and footage.

128. Dr. Klein mischaracterized Mr. Ellis's two hours of weekend activity as "very active."

129. This is not the first time Dr. Klein has been caught reaching faulty conclusions. In *McCormick v. United of Omaha Life Ins. Co.,* No. SACV 12-01924-CJC (RNB) (Doc. 38) (C.D. Cal. May 6, 2014), the Court gave less weight to Dr. Klein's opinion that the claimant's treating physicians because Dr. Klein, as here, never actually saw the claimant. The Court found a treating physician's rebuttal of Dr. Klein's paper review more credible and awarded benefits to the claimant. *McCormick v. United of Omaha Life Ins. Co.,* No. SACV 12-01924-CJC (RNB), 2014 WL 121594135 at *1 (C.D. Cal. July 31, 2014.)

130. The Court specifically rejected Dr. Klein's reliance on the lack of negative performance reviews as evidence of lack of cognitive impairment, taking Dr. Klein to task for ignoring evidence in the file showing how the claimant concealed and compensated for her symptoms at work. *McCormick,* (Doc. 38 at 11.)

131. Here, Dr. Klein is oblivious to that fact that 13 days of surveillance showed Mr. Ellis leaving his home only once and engaging in intermittent activity for approximately two hours over the course of two days.

**OBER PEKAS RONSTADT**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

132. Given the demonstrated inaccuracy of her observations and history of ignoring relevant evidence, relying on Dr. Klein's recounting of the content of the video surveillance is unreasonable.

133. In addition, G4S is biased because it strives to meet its clients' expectations that the surveillance will provide a reason not to pay claims.

134. G4S advertises to its clients that, "G4S takes pride in preserving your reputation in a marketplace where cost-effectiveness and bottom-line benefits dominate" and it will "help you minimize risk, limit liability and avoid the costly consequences of regulatory compliance problems." "We help you develop and implement investigative and compliance strategies **focused on reducing risk while increasing revenue.**"

135. Despite the law imposing fiduciary duties on insurance companies when dealing with their insureds, G4S advocates, "[t]he insurance company is not in business to help the public, the insurance company . . . is in business to make money."

136. According to G4S, "[t]he very nature of surveillance demands that certain factors be taken into consideration to protect rights of the subject, and the integrity of the investigation."

137. G4S recognizes a tension between the "claimant's right to privacy" and an insurer's right to investigate.

138. G4S knows that the claimant's rights restrict what it can do. "Investigators must limit themselves to reasonable means of surveillance, or risk exposing themselves and the insurer to the liability of a tort claim."

139. According to G4S, following a claimant conspicuously is unreasonable. Nevertheless, Mr. Ellis detected G4S's surveillance on December 11, 2016, but G4S continued the surveillance until a neighbor detected G4S's investigator.

140. Further undermining G4S's credibility and reliability is that the surveillance report is not verified by the investigator who recorded the videos or made the observations,

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

and there are discrepancies between what the investigator told the Ellises when she was detected and what the report says the investigator said.

141. At least part of the report is inaccurate and given G4S's objective is to help its clients reduce liability and increase profits, it is reasonable to suspect the report is improperly drafted to meet Liberty's expectations of denial.

142. G4S's Code of Ethics also provides, "all services that [it] provides must be conducted in a legal . . . manner" and because "there is a reasonable probability that [a] video will end up in court," G4S claims that its videos will be admissible because they "are submitted through a firewalled and password protected portal."

143. But in August 2017, a New York court questioned evidence maintained by G4S because it did not comply with the standard regarding electronically stored images. *Vriaku v. Plaza Const. Corp.,* 57 Misc.3d 643 (Sup. Ct. Aug. 22 2017). G4S could not prove that its record keeping system does not permit "additions, deletions, or changes without leaving a record of such additions deletions or changes" or explain "the manner or method by which tampering or degradation of the reproduced record is prevented." *Id.* In *Geller v. Provident Life and Acc. Ins. Co.,* No. 5:10-cv-00096, 2011 WL 1239835 a *4 (W.D.N.C. March 30, 2011) the court found the plaintiff had stated a *prima facie* case of invasion of privacy against G4S for the manner in which it conduced surveillance of the plaintiff.

144. That G4S acts in accordance with the law and properly preserves evidence is questionable. Given those questions, the known inaccuracies in the surveillance report, and G4S's stated bias, relying on G4S is unreasonable.

145. The surveillance does not inform Mr. Ellis's main problems of cognitive deficits and fatigue, which would not show in surveillance footage. As Liberty should be aware, these are not visible, exertional impairments.

146. The surveillance does not evaluate Mr. Ellis's ability to work at a consistent pace or consider his rate of expected absenteeism due to medical appointments and symptomology or his ability to understand and remember instructions or maintain attention

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

and concentration. Relying on surveillance to assess cognitive function is unreasonable, arbitrary, and capricious.

147. The activity captured does not translate into an 8-hour workday and certainly not into a 40-hour workweek.

148. Liberty should not penalize Mr. Ellis for a modest effort to engage in a normal life activity. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("[S]everal courts . . . have recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.")

149. Relying on scant video surveillance to assess fatigue, cognitive impairment, or an episodic condition is unreasonable.

150. In conjunction with the FCE, Mr. Goldstein watched Mr. Ellis's surveillance video footage and concluded that, "[t]he videos reviewed do not affect or change the scoring of the FCE or the findings. This episodic health condition that Mr. Ellis is suffering from does not affect him constantly, and his dramatic changes in blood pressure which this evaluator witnessed and measured **cannot be feigned**." (emphasis added).

151. The surveillance activity captured is entirely consistent with Mr. Ellis's reported functionality and only further corroborates the FCE findings and substantiates his Disability. However, Liberty failed to consider the surveillance video in its entirety. If Liberty actually watched the surveillance video, which it plainly did not, Liberty would have realized its reasons for terminating benefits were unsupported. Further, the surveillance does not constitute "significant changed circumstances" to justify Liberty's termination of benefits.

### *The Appeal*

152. Mr. Ellis appealed the Denial on October 10, 2017 and supplemented his appeal on November 9, 2017 and December 1, 2017.

153. The evidence submitted on appeal included, *inter alia,* updated current medical records, an FCE, a vocational assessment, and declarations of Mr. Ellis and his wife.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

### *Vocational Evaluation*

154. In an effort to better understand Mr. Ellis's vocational capabilities, Mark Kelman, MS, CRC, CVE conducted a vocational evaluation on September 15, 2017, which included an in-person interview with Mr. Ellis and a review of the file. Mr. Kelman concluded:

> [B]ased on the totality of medical reports, especially those that have been treating Mr. Ellis, that he would not be competitively employable in his usual and customary work as well as any other occupation which would approximate 80% of his basic monthly earnings. His past work, or for that matter, any jobs for which he would have any transferable skills, would be outside of his limitations as they would be very demanding from a cognitive standpoint. His past relevant work or a sampling of reported alternative job titles from Ms. Patricia Thal would be outside of Mr. Ellis's cognitive levels of functioning as documented by his treating medical specialists.

### *Treating Provider Assessments*

155. Due to his medical conditions, Mr. Ellis is incapable of performing, with reasonable continuity, the duties of his Own Occupation or Any Occupation.

156. Dr. Caselli explains:

> Regardless of his diagnosis, Charles' symptomology prevents him from performing any consistent full-time employment at this time. . . . Cognitively, he is limited in his ability to understand and remember detailed instructions, maintain attention and concentration, and setting realistic occupational goals. As the day progresses, Charles' cognitive function would decline secondary to fatigue. His lack of stamina alone would preclude him from sustaining work on a regular and continuous basis (8 hours a day, 5 days per week).

157. Mary Jane Trunzo from the AICCD explains that Mr. Ellis has been evaluated and receiving weekly cognitive-communication intervention since September 2015 for the following issues: auditory processing/comprehension deficits, decreased speed of processing, word findings and confrontational naming difficulties, reading comprehension impairments, memory and attention impairments, poor reasoning/problem solving/judgment, severe pragmatic communication deficits, and impaired executive function skills.

158. Ms. Trunzo notes that, "[a]ll of these deficits impact his ability to effectively and efficiently execute tasks of daily living across the home, work, and community environments." She concludes:

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

> Given the severity and complexity of his deficits, Mr. Ellis remains unable to work at this time. His cognitive-communication deficits negatively impact his ability to complete work related tasks. Mr. Ellis experiences severe cognitive fatigue after only minutes of cognitive work. He requires numerous breaks during his one hour sessions. Minimal cognitive output leads to severe physical efforts, such as nausea, dizziness, ringing in the ears, and headaches. Cognitive effort has even lead to a full "episode" during which Mr. Ellis lost the ability to speak and move during the therapy session. . . .[I]t is my medical opinion that Mr. Ellis would not be able to sustain any type of full time employment and this opinion is with the highest degree of medical probability.

*FCE*

159. In addition to his treating provider assessments, Mr. Ellis underwent an FCE on October 19, 2017 with Mr. Sanford Goldstein who concluded that Mr. Ellis could not perform any work, sedentary or otherwise.

160. The FCE consisted of a review of the medical file, as well as a physical examination and testing of Mr. Ellis's capabilities.

161. Of significance, Mr. Goldstein witnessed one of Mr. Ellis's paroxysmal episodes:

> [I]t was obvious that [Mr. Ellis] had become unresponsive and unable to follow instructions or respond to verbal commands, and that he was having a seizure-like episode.
>
> [When t]he subject had regained the ability to speak and comprehend the spoken word from this evaluator. He reported that he felt like "something had happened to him" and noted that anytime he experiences these types of events, he often feels a prolonged residual effect, described as a "hangover" type feeling for one-three days following.

162. Based upon a valid and reliable performance on all test elements performed by Mr. Ellis, Mr. Goldstein concluded, "he is UNABLE to perform the physical demands or material duties of his past work or ANY work including SEDENTARY work on a regular and consistent basis."

163. Mr. Goldstein further notes, "[Mr. Ellis's] episodic health condition has NOT been solved and based on the results of the FCE, pose significant safety risks for himself and others in a work environment."

*Liberty Has Already Found Mr. Ellis Disabled, and There Has Not Been a Significant Change in His Medical Conditions*

164. Liberty previously found Mr. Ellis Disabled under the Plan:

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

- On October 14, 2015 Nurse Case Manager, Julia Millay, opined that, "with the available medical [records,] [restrictions and limitations] of no activity that requires focus, concentration, executive functioning, operating heavy machinery or working at heights is reasonable and supported 5/15/15 through the [estimated return to work] date of 11/2/15 due to the diagnoses, abnormal cognitive findings on the 9/28/15 evaluation."

- On January 15, 2016, Dr. Nick Defilippis conducted a medical file review and concluded that, "[t]he medical records do support the presence of a cognitive impairment as indicate by the neuropsychological evaluations by Dr. Walter and also speech therapy testing. These indicate the presence of cognitive slowing and memory problems." Dr. Defilippis further opined that, "[t]he medical records reasonably support that [Mr. Ellis] has impairments attributable to the presence of mental illness that would preclude him from carrying out usual life activities, including work related activities." From May 16, 2015 and forward, Dr. Defilippis concludes that Mr. Ellis would "having difficulty functioning in a work situation" and "would be unreliable in attendance in a work setting." "The unreliability would be continuous and would not allow him to be present to meet schedule work activities."

- Liberty's January 18, 2016 internal notes state, "[r]ecommending approval of own [occupation]… with [Mental/Nervous] as [restrictions and limitations] preclude [Mr. Ellis] from performing [his] own [occupation] as of the LTD [begin date]." Diagnoses for approval are identified as Cognitive Disorder, NOS, Chronic Pain Disorder, Cervical Dystonia, Paroxysmal Spells, and Post-Concussion Syndrome.

- On January 19, 2016, Liberty's Claim Manager, Elissa Dipaola-Tromba, "agrees [with] the decision to reopen claim for [additional information] and approve claim for own [occupation] based on [diagnoses], [treatment] plan and peer reviews on file as outlined by DCM."

- Liberty's October 25, 2016 internal notes state, "IM peer review and neuropsych[ological] peer review completed 1/15/16 supported impairment from ***any occ[upation]*** thru ***at least*** April 2016." (Emphasis added.)

165. The medical records demonstrate that Mr. Ellis's condition has not improved, and, in fact, has only worsened.

166. Liberty has no evidence of medical improvement that would enable Mr. Ellis to return to work in his Own Occupation or Any Occupation.

### *Liberty Failed To Conduct A Full And Fair Review*

167. Liberty breached its fiduciary duties by acting as Mr. Ellis's adversary during the claim process and failing to conduct a full and fair review and apprise Mr. Ellis of the information it needed before terminating benefits.

168. Liberty's procedural violations reveal its intent to deny Mr. Ellis's claim and is breach of fiduciary duty, as well as an abuse of discretion. For example, Liberty:

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

- Cited to outdated ERISA regulations, failing to apprise Mr. Ellis of his true rights on appeal;
- Disingenuously instructed Mr. Ellis to submit on appeal whatever information he "feels" would support his claim, which is antithetical to Liberty's requirement to engage in 'meaningful communication' with Mr. Ellis;
- Retained file reviewers without knowing those reviewers' qualifications beforehand;
- Doggedly pursued surveillance in the hopes of finding evidence against Mr. Ellis;
- Misled Mr. Ellis in telephonic discussions with the aim of bolstering Liberty's denial;
- Failed to request and secure medical evidence it knew could be supportive to the continuation of Mr. Ellis's benefits;
- Created barriers to Mr. Ellis's and other claimants' receipt of relevant documents by requiring claimants to "fax" or mail requests instead of using email;
- Preemptively denied, or "closed," Mr. Ellis's claim before having all relevant information and without reviewing its own surveillance;
- Relied excessively on biased vendors and resulting reports from those such as G4S and MCMC;
- Required Mr. Ellis to represent to the Social Security Administration he was disabled while simultaneously refusing to acknowledge his disability when it comes to paying continued benefits;
- Drafted a borderline illegible and inaccurate denial letter;
- Misrepresented Mr. Ellis's treating provider assessments in written and telephonic communication;
- Ignored the entirety of Mr. Ellis's symptoms; and
- Failed to conduct a meaningful vocational analysis.

169. In a letter dated January 5, 2018, Liberty denied Mr. Ellis's appeal (the "Final Denial").

170. Liberty relied on new paper reviewers who rejected the treating physicians' opinions.

171. Specifically, in the Final Denial, Liberty hired Edan Critchfield, Psy.D, and Dr. David Hoenig, neurologist.

172. Dr. Hoenig routinely drafts biased reports for insurers.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

173. Of particular note is that one reviewer confirmed Mr. Ellis's symptoms, but rejected the claim because of a lack of objective evidence and the other reviewer rejected the FCE because it was "not done by a physician" and the evaluation was incomplete **"because [Mr. Ellis] became unresponsive."**

174. Physicians do not perform functional capacity evaluations, which Dr. Hoenig and Liberty fully understand.

175. Dr. Hoenig provided the unreasonable opinion that, "[i]f [Mr. Ellis] has a headache that requires acute care by a physician, the claimant would not be would work[sic] that particular day. Otherwise, there are no clear physical restrictions and limitations."

176. Liberty improperly provided the new paper reviewers with previous paper reviewers' reports.

177. Mr. Ellis cannot perform the material duties of his Own Occupation or Any Occupation and therefore comes within the definition of Disability under the Plan.

178. Mr. Ellis exhausted his administrative remedies and timely filed this lawsuit.

**COUNT I**
**(Recovery of LTD Plan Benefits)**
**(Defendants Liberty and the Plan)**

179. All other paragraphs are incorporated by reference.

180. The Plan is an Employee Welfare Benefit Plan as defined in ERISA, 29 U.S.C. § 1002.

181. The Plan represents LTD coverage and a promise to provide LTD benefits until Mr. Ellis is no longer Disabled under the terms of the Plan.

182. Mr. Ellis continues to be Disabled for his Own Occupation and Any Occupation.

183. Mr. Ellis has claimed the benefits under the Plan to which he is entitled.

184. Mr. Ellis reasonably expected that his medical conditions met the requirements of Disability as defined by the Plan and that he would receive benefits under the Plan for the maximum benefit period or until he was no longer disabled.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

185. Despite the coverage of Mr. Ellis's Disability, Liberty and the Plan improperly terminated his LTD benefits in breach of the Plan and ERISA.

186. Liberty's and the Plan's conduct was arbitrary, capricious, an abuse of discretion, not supported by substantial evidence, and clearly erroneous.

187. Although the Policy states Liberty has discretion to construe the terms of the policy and to determine benefit eligibility, under ERISA, that can only be true if the Plan reserved that discretion to the Plan Administrator, the Plan terms provide a mechanism for the Plan Administrator to delegate that discretion, and there is evidence that the discretion was delegated in accordance with the terms of the Plan.

188. On information and belief, the Plan: does not reserve discretion to the Plan Administrator, does not contain terms by which discretion can be delegated, and therefore, under ERISA, discretion could not be delegated to Liberty.

189. Even if UTC properly delegated discretionary authority to Liberty, in light of Liberty's wholesale and flagrant procedural violations of ERISA, Mr. Ellis's should be entitled to *de novo* review. *See Halo v. Yale Health Plan,* 819 F.3d 42, 60-61 (2d Cir. 2016) ("when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent and harmless.")

190. Instead of evaluating a participant's eligibility based on the applicable plan language and medical evidence, Mr. Ellis is informed and believes that Liberty makes claims decisions based on the claims resources and financial risk it faces on certain claims.

191. Liberty wrongfully denied Mr. Ellis's disability benefits without providing a coherent explanation for its denials, and in a way that conflicts with the plain language of the Plan, violating 29 U.S.C. §§ 1109, 1132.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

192. Liberty did not properly consider all of the available evidence when terminating Mr. Ellis's benefits.

193. Liberty failed to conduct a full and fair review.

194. For its own financial benefit Liberty misstated medical evidence, relied on biased medical reviews, engaged biased investigators, and ignored evidence supporting Mr. Ellis's claim.

195. Liberty relied on findings that constitute "clearly erroneous findings of fact" to deny Mr. Ellis's benefits.

196. Liberty abused its discretion by basing its decision on unreliable and inaccurate information. When confronted with this knowledge, Liberty ignored the inaccuracies or created new reasons for denial.

197. Upon information and belief, Liberty's tainted its medical file reviewers by giving the reviewers inaccurate information regarding Mr. Ellis, while also failing to provide its reviewers with all of the relevant evidence.

198. Upon information and belief, Liberty provided its reviewers and vendors with internal notes and financial information about the claim, compromising their ability to make "independent" medical determinations and creating further bias in reviews.

199. Upon information and belief, Liberty did nothing to insulate the appeals reviews from its initial determination and used the same claims managers throughout Mr. Ellis's administrative appeals process, or at least used employees who were managed by the same person(s) and who were orchestrating the denial according to Claim Discussion directives. *See 29* C.F.R. 2560.503-1(h)(3)(ii), (h)(4) (requires claim fiduciaries to "[p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual.").

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

200. Liberty routinely emphasizes information that favors a denial of benefits while deemphasizing other information that suggests a contrary conclusion.

201. Liberty failed to properly consider the opinions of Mr. Ellis's treating and examining physicians.

202. In terminating Mr. Ellis's LTD benefits, Liberty completely disregarded evidence that Mr. Ellis's conditions had not changed or improved.

203. Liberty has no evidence that Mr. Ellis's conditions changed or improved since it determined that he met the definition of Disabled in the Policy.

204. The peer reviewers arbitrarily reached their opinions based on insufficient evidence or investigation.

205. None of Liberty's reviewing physicians ever set forth any substantive reasons why Mr. Ellis's treating doctors' opinions were incorrect.

206. Liberty failed to explain why it credited the physician reviewers over Mr. Ellis's treating physicians.

207. The peer reviewers were not given the Plan or other important records for reaching its decision that Mr. Ellis could perform work.

208. Liberty's claim process is designed to server its own financial best interests.

209. On information and belief, Liberty engaged in claim discussions to decide the directions of appeals without having reviewed all of the medical evidence, demonstrating its predetermination to terminate benefits.

210. Liberty intentionally gathered evidence to support a decision to deny benefits.

211. Mr. Ellis alleges upon information and belief that Liberty has a parsimonious claims handling history.

212. Lincoln Financial Group ("Lincoln Financial") announced on January 19, 2018 that it has entered into a definitive agreement to acquire Liberty's disability business. Upon completion of the transaction, Lincoln Financial will retain Liberty's Group Benefits

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

business and reinsure Liberty's Individual Life and Annuity business to Protective Life Insurance Company.

213. Mr. Ellis is informed and believes that Lincoln Financial's acquisition of Liberty influenced its claim termination rates, including its decision to terminate Mr. Ellis's claim.

214. Mr. Ellis is informed and believes that Liberty intentionally terminated claims, including Mr. Ellis's, in advance of Lincoln Financial's acquisition of its disability business.

215. Discovery into the acquisition and potential impact on Liberty's structural conflict of interest in deciding Mr. Ellis's claim is warranted in light of the acquisition.

216. Liberty failed to conduct a "meaningful dialogue" regarding Mr. Ellis's claim.

217. Under the de novo standard of review, to be entitled to benefits Mr. Ellis need only prove by a preponderance of the evidence that he is disabled.

218. Even under the abuse of discretion standard of review, Liberty abused its discretion, because its decision terminating Mr. Ellis's disability benefits was arbitrary and capricious and caused or influenced by Liberty's, its reviewing physicians, and its vendors' financial conflicts of interest. These conflicts of interest precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

219. Mr. Ellis is entitled to discovery regarding the effects of the procedural irregularities and structural conflict of interest that infiltrated the claims handling process and also regarding the effects of Liberty's reviewing physicians', its employees', and its vendors' financial conflicts of interest, biases, and motivations on the decision terminating Mr. Ellis's LTD claim.

220. Under the de novo standard of review, Mr. Ellis is entitled to discovery regarding, among other things, the credibility of Liberty's medical reviews and Liberty's lack of partiality due to its financial conflicts of interest. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (under the de novo standard of review, new evidence may be admitted regarding, among other things: "the credibility of

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

medical experts… [and] instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (*quoting Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1026-27 (4th Cir. 1993)).

221. Pursuant to the coverage provided in the Plan, to ERISA 29 U.S.C. § 1132(a)(1)(B), and to applicable federal law, Mr. Ellis is entitled to recover all benefits due under the terms of the Plan, and to enforce his rights under the Plan.

222. Mr. Ellis is entitled to reinstatement of any other employee benefits that were terminated, discontinued, or suspended as a result of the termination of his disability benefits. He is entitled to a restoration of the *status quo ante* before LTD benefits were wrongfully terminated.

223. Pursuant to 29 U.S.C. § 1132(g), Mr. Ellis is entitled to recover his attorneys' fees and costs incurred herein.

224. Mr. Ellis is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid.

**COUNT II**
**(Breach of Fiduciary Duty)**
**(Liberty)**

225. All other paragraphs are incorporated by reference.

226. Under 29 U.S.C. § 1132(a)(3), this Court may enjoin any act or practice that violates ERISA or the terms of the Plan, as well as grant other appropriate equitable relief, provided that such relief is not recoverable under 29 U.S.C. § 1132(a)(1)(B).

227. Liberty is a fiduciary and owes fiduciary duties to Plan participants, including Mr. Ellis.

228. Under 29 U.S.C. § 1104(a), Liberty is required to discharge their duties with the care, skill, prudence, and diligence under the circumstances that a prudent man acting in like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a).

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

229. Under ERISA, which is founded in trust principles, Liberty is required to administer claims in the best interests of beneficiaries and participants as part of its fiduciary duty.

230. In multiple ways throughout the administration of Mr. Ellis's claim, Liberty breached its fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3).

231. Liberty's arbitrary and capricious claims handling generally constitutes a breach of fiduciary duty, because Liberty's claims handling was discharged imprudently and caused Mr. Ellis serious harm that cannot be recovered under 29 U.S.C. § 1132(a)(1)(B).

232. To the extent that Liberty's denial of benefits caused Mr. Ellis harm unrecoverable under 29 U.S.C. § 1132(a)(1)(B), then that harm is recoverable under 29 U.S.C. § 1132(a)(3).

233. On information and belief, Liberty instructs and/or incentivizes certain employee(s) to terminate fully insured LTD claims and appeals based on bias or its financial interests.

234. Lincoln Financial Group announced on January 19, 2018 that it has entered into a definitive agreement to acquire Liberty's disability business. Upon completion of the transaction, Lincoln Financial will retain Liberty's Group Benefits business and reinsure Liberty's Individual Life and Annuity business to Protective Life Insurance Company.

235.

236. Mr. Ellis is informed and believes that Liberty's employees are trained in administering claims in the best interests of Liberty, not Plan participants.

237. Liberty demonstrated bias and malice against Mr. Ellis through its employees. Instead of fully and fairly reviewing the medical evidence, Liberty unreasonably denied Mr. Ellis's claim based on unreliable evidence.

238. Liberty's failure to act prudently and in the best interests of Mr. Ellis is a breach of fiduciary duty requiring appropriate equitable relief following discovery of Liberty's conduct as it relates to Mr. Ellis's claim.

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

239. Mr. Ellis is informed and believes that Liberty has targeted claims under the Plan, including Mr. Ellis's, which is a breach of fiduciary duty.

240. On information and belief, Liberty breached its fiduciary duty to Mr. Ellis by terminating his claim in an effort to avoid its financial liability.

241. Based on the facts of this case, Mr. Ellis has "other equitable relief" available to him in several forms, including but not limited to surcharge,[1] because the relief available under 29 U.S.C. § 1132(a)(1)(B) does not make Mr. Ellis whole for his losses from Liberty's breaches of fiduciary duty.

242. The Court has broad discretion to fashion appropriate relief to make Mr. Ellis whole and should mold the relief necessary to protect the rights of participants.

243. Mr. Ellis is entitled to injunctive or mandamus relief under 29 U.S.C. § 1132(a)(3).

244. Mr. Ellis is entitled to enjoin any act or practice by Liberty that violates ERISA or the Plan, or seek other appropriate equitable relief that is traditionally available in equity.

245. If Mr. Ellis prevails and is placed back on claim, he is entitled to enjoin the following conduct in the ongoing handling of his claim:

- Liberty's reliance on Drs. Klein, Gilman, and Blackwood;
- Liberty's reliance on Thal's vocational review;
- Liberty's use of biased investigators to conduct surveillance;
- Liberty's reliance on surveillance to decide claims based on cognitive impairments;
- Liberty's reliance on medical reviewers who do not meet the Policy definition of Physician;
- Liberty's demand for objective medical evidence, which is not a requirement of the Plan;
- Liberty's demand for a definitive diagnosis, which is not a requirement of the Plan.

[1] A surcharge is a kind of equitable monetary remedy against a trustee, which puts the beneficiary in the position he would have attained but for the trustee's breach. Surcharge extends to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary.

- Liberty's citation to outdated ERISA claims procedures;

246. Liberty concealed Mr. Ellis's class of coverage during the claim, which constituted a breach of fiduciary duty.

247. Liberty concealed Mr. Ellis's class of coverage during the claim, which constituted a breach of fiduciary duty.

248. Even if Mr. Ellis is disabled from a mental/nervous condition, he is entitled to benefits until age 65 as long as he meets the other Policy requirements.

249. Liberty was unjustly enriched as a result of its breach of fiduciary duty violations, because it wrongfully withheld Mr. Ellis's benefits for its own profit.

250. Liberty engaged in several procedural violations in an attempt to circumvent its obligations under ERISA, which is conduct the Court can enjoin.

251. Liberty acted with malice and in bad faith against Mr. Ellis, which constitutes a violation of its fiduciary obligations.

252. ERISA "does not elsewhere adequately remedy" the injuries caused to Mr. Ellis by Liberty's breaches of fiduciary duty violations.

253. As a direct and proximate result of the breaches of fiduciary duty, Mr. Ellis suffered actual, *significant* financial harm and has incurred financial expense.

254. The Ellises have drained savings accounts, compromised investments, and sold personal belongings to make ends meet as a result of Liberty's breaching conduct.

255. Mr. Ellis is entitled to prejudgment interest on the benefits to which he is entitled and on his damages at the highest legal rate until paid in full.

256. Pursuant to 29 U.S.C. § 1132(g), Mr. Ellis is entitled to recover his attorneys' fees and costs incurred herein.

**WHEREFORE**, on all claims, Mr. Ellis prays for entry of judgment against Defendants as set forth in this Complaint, which includes:

A. All past LTD benefits under the terms of the Plan;

B. Clarifying, declaring, and determining Mr. Ellis's rights to future benefits under the terms of the Plan;

OBER PEKAS RONSTADT
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

**OBER PEKAS RONSTADT**
3030 North 3rd Street, Suite 1230
Phoenix, AZ 85012
(602) 277-1745

C. For any other benefits Mr. Ellis may be entitled to receive under the Plan due to his disability;

D. All other equitable relief that is proper as a result of Liberty's breaches of fiduciary duties;

E. An award of Mr. Ellis's attorneys' fees and costs incurred herein;

F. An award of prejudgment interest on benefits and damages at the highest legal rate until paid; and

G. For such and further relief as the Court deems just, equitable, and reasonable.

Dated this 28th day of March, 2018.

OBER PEKAS RONSTADT

By: *s/ Erin Rose Ronstadt*
Erin Rose Ronstadt
Kevin Koelbel
Clayton W. Richards
Attorneys for Plaintiff